IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| CARL EUGENE PONDER, | } |
| Plaintiff, | } |
| v. | } Case No.: 1:12-cv-00765-RDP |
| MICHAEL ASTRUE, Commissioner of Social Security | } |
| Defendant. | } |

**MEMORANDUM OF DECISION**

Plaintiff Carl Eugene Ponder ("Plaintiff") brings this action pursuant to Sections 205(g) and 1613(c)(3) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner or Social Security[1] ("Commissioner") denying his applications for a period of disability and disability insurance benefits ("DIB") under Title II and supplemental security income benefits ("SSI") under Title XVI. *See* 42 U.S.C. §§ 405(g), 1383(c). For the reasons outline below, the court finds that the decision of the Commissioner is due to be affirmed.

**I.     Proceedings Below**

On February 26, 2009, Plaintiff filed applications for DIB under Title II of the Act and for SSI under Title XVI of the Act. [R. 9, 163-166, 186-197]. In both applications, Plaintiff alleged a disability onset date of October 15, 2007. [R. 9]. Plaintiff's DIB application was originally denied on July 6, 2009. [R. 67]. Plaintiff's SSI application was originally denied on July 16, 2009. [R. 72]. Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which was held on March 25, 2011. [R. 23-65]. In his May 16, 2011 decision, the ALJ denied disability benefits

---

[1] On February 14, 2013, Carolyn Colvin became the Acting Commissioner of Social Security.

concluding that Plaintiff was not disabled under Sections 216(i), 223(d), or 1614(a)(3)(A) of the Act. [R. 22]. After the Appeals Council denied Plaintiff's request for review of the ALJ's decision, that decision became the final decision of the Commissioner, and therefore a proper subject of this court's review. *See* 42 U.S.C. §§ 405(g), 1383(c).

At the time of the hearing, Plaintiff was 41 years old and had completed eighth grade. [R. 23, 55, 163]. Plaintiff last worked in October 2007 when he was terminated from FabArc Steel for his involvement in a crane accident. [R. 30]. Plaintiff testified that, even if he had not been involved in the accident, he doubted he would still be working due to gout in his feet and legs. [R. 30]. Plaintiff worked for Buford's Tree Service in 2009 until he was terminated because he "was too slow." [R. 32]. After further questioning from the ALJ, Plaintiff remembered he was actually fired for getting a truck stuck. [R. 32]. Plaintiff then claimed that he was probably fired because he had a flare of gout on the road. [R. 33].

Regarding his physical limitations, Plaintiff stated that he has gout flare ups every two to three weeks. [R. 31]. Sometimes he has difficulty walking. [R. 31]. Plaintiff also discussed his bipolar disorder and claimed that sometimes he will stay awake for three to four days at a time and then sleep for anywhere from eighteen (18) hours to two days. [R. 40].

Plaintiff's wife also appeared at the hearing and testified as a witness on his behalf. She stated that Plaintiff does not have a "normal" day. [R. 53]. Plaintiff's wife claimed that his mood is affected by how much sleep he receives the night before. [R. 53]. According to Plaintiff's wife, some days Plaintiff roams the house, watches television, and walks the dog. [R. 53]. Plaintiff's wife testified that Plaintiff appears distracted during the day and cannot function properly. [R. 54]. Plaintiff's wife testified that Plaintiff's bipolar medication affects his gout and causes flare ups. [R.

2

33]. Plaintiff's wife also stated that Plaintiff is dyslexic and cannot read. [R. 39]. Plaintiff stated that he cannot write a check and cannot read mail. [R. 55].

The ALJ asked Plaintiff why he could not perform a welding job that permitted him to sit during the work day. [R. 42-43]. In response, Plaintiff stated that he was not aware of any such jobs in Alabama. [R. 43]. In response to questioning by the ALJ, a vocational expert ("VE") classified Plaintiff's past relevant work as a welder as medium-skilled work and as heavy-skilled. [R. 56]. The VE classified Plaintiff's past relevant work as a material handler as heavy-semiskilled and his past relevant work as a tree surgeon helper as medium-semiskilled. [R. 56]. After listening to the ALJ review evidence of record demonstrating that Plaintiff was able to mentally calculate various math and reasoning problems, the VE stated that someone with this ability and dyslexia could perform Plaintiff's past relevant work. [R. 558-559].

Plaintiff submitted medical records in support of his disability claim. The evidence of record regarding Plaintiff's gout is minimal at best. Discharge instructions from a March 9, 2011 visit to Northeast Alabama Regional Medical Center indicate Plaintiff was diagnosed with gout. [R. 379]. These notes explain what gout is but contain no details about Plaintiff's complaints or how Plaintiff was actually affected by the disease. [R. 379]. Because this was the only evidence of record pertaining to Plaintiff's gout, the ALJ referred Plaintiff to Dr. Chang-Kon Jin for a disability determination exam on April 18, 2011. [R. 387-388].

Dr. Jin reviewed Plaintiff's medical records and considered them in making his findings. [R. 387]. Dr. Jin noted Plaintiff's history of the following: low back, feet, leg, and knee pain; bipolar disorder; and dyslexia. [R. 387]. During Dr. Jin's examination, Plaintiff's shoulder, elbows, wrists, hips, knees, and ankles demonstrated no limitation in range of motion. [R. 388]. Plaintiff was able

3

to walk on his toes and heels. [R. 388]. Plaintiff's left sole revealed one soft tissue mass lesion. [R. 388]. Plaintiff could squat with assistance fairly well and his "grip power, and pushing and pulling power" were "okay." [R. 388]. Dr. Jin diagnosed Plaintiff with lumbago with pain in the legs; bipolar disorder; and dyslexia. [R. 388]. According to Dr. Jin, Plaintiff's main problems were associated with psychotic changes as his lumbago was currently "not a major problem."

Dr. Jin also completed a medical source statement regarding Plaintiff's ability to do work-related physical activities. [R. 389-395]. Dr. Jin opined that Plaintiff could lift and carry up to twenty (20) pounds frequently. [R. 389]. Dr. Jin also concluded that Plaintiff could sit, stand, or walk for ten (10) minutes without interruption and that Plaintiff could sit for a total of five (5) hours in a work day but could only stand for two (2) hours and could only walk for a total of one (1) hour. [R. 390]. Regarding Plaintiff's use of his hands, Dr. Jin determined that Plaintiff could frequently reach overhead and could occasionally handle, finger, feel, and push/pull. [R. 391]. Regarding Plaintiff's use of his feet, Dr. Jin concluded that Plaintiff should never operate foot controls. [R. 391]. Regarding postural activities, Dr. Jin opined that Plaintiff could occasionally climb stairs and ramps and could occasionally balance but should never climb ladders or scaffolds, stoop, kneel, crouch, or crawl. [R. 392]. Regarding environmental limitations, Dr. Jin determined that Plaintiff could occasionally operate a motor vehicle and could occasionally be exposed to extreme heat but should never be exposed to unprotected heights, moving mechanical parts, humidity and wetness, dust, odors, fumes, extreme cold, or vibrations. [R. 393].

Plaintiff's medical records regarding his bipolar disorder are more thorough than those presented regarding his gout. The earliest records pertaining to Plaintiff's mental health are from a November 2004 office visit with Dr. Glenn Archibald, Plaintiff' treating psychiatrist. These

records and several others from visits before 2007 concern a period of time prior to the alleged disability onset date. However, by May 2008, Plaintiff was still seeing Dr. Archibald, who noted that Plaintiff had relapsed after losing his job seven months before. [R. 296]. In August 2008, Plaintiff's treatment notes indicate that his progress was "stable." [R.294]. In December 2008, Dr. Archibald indicated that Plaintiff was "better" and that his energy and motivation were "good." [R. 292]. During this visit, Plaintiff received refills for all of his prescription medication. [R. 292]. A May 11, 2009 treatment note indicates that Plaintiff's progress was "worse" and that Plaintiff's mood was depressed. [R. 317]. During this visit Plaintiff told Dr. Archibald he believed he was most recently fired because he has gout and could not work. [R. 317]. Dr. Archibald also noted that Plaintiff "got a truck stuck" and that may have led to his firing. [R. 317]. This treatment note also includes the phrase "Can't hold a job." [R. 317]. A final treatment note from January 23, 2011 stated that Plaintiff had no new problems but indicated that he was not sleeping well at night. [R. 377].

    Dr. Archibald completed a Supplemental Questionnaire as to Plaintiff's RFC and an Affective Disorders Questionnaire in early August 2009. [R. 341-345]. On the RFC Questionnaire, Dr. Archibald indicated that Plaintiff had a moderately severe impairment in his ability to relate to other people, to respond appropriately to co-workers, to perform complex tasks, to perform repetitive tasks, and to perform varied tasks. [R. 341-342]. Dr. Archibald also noted that Plaintiff had a severe limitation in his ability to respond to customary work pressures. [R. 341]. Based upon Plaintiff's mental condition, Dr. Archibald stated that he did not believe Plaintiff was currently able to return to gainful employment. [R. 343]. Dr. Archibald also indicated that he did not believe Plaintiff would be able to return to gainful employment at some future date. [R. 343]. On the Affective Disorder Questionnaire, Dr. Archibald stated that Plaintiff suffers from depressive syndrome characterized

5

by sleep disturbance, psychomotor agitation, decreased energy, and difficulty concentrating or thinking. [R. 344]. Dr. Archibald also indicated that Plaintiff suffers from manic syndrome characterized by pressure of speech and decreased need for sleep and that Plaintiff suffers from bipolar syndrome. [R. 344]. Based upon these disorders, Plaintiff had repeated episodes of decompensation, each of extended duration. [R. 345].

In addition to these treatment notes from Plaintiff's treating psychiatrist, several other evaluations or reports regarding Plaintiff's mental condition are included in the record. On June 10, 2009, Mary Arnold, Psy. D., completed an agency consultative psychological examination. [R. 338-341]. Dr. Arnold noted that Plaintiff's demeanor was "amiable and calm" and that his mood was "broad with congruent affect." [R. 339]. Dr. Arnold's examination notes indicate that Plaintiff was "amused by some interview items" but that he was cooperative. [R. 339]. Plaintiff displayed no cognitive deficit and was able to perform a series of calculations and recall drills. [R. 339]. Plaintiff displayed fluid speech, made eye contact and was able to reach goal ideas without tangential or circumstantial thinking. [R. 339]. Dr. Arnold indicated that without the benefit of formal testing, she would estimate Plaintiff's IQ to be in the low average range. [R. 340]. During the examination, Plaintiff told Dr. Arnold that it takes him "one day to mow two acres" and that he enjoys "piddl[ing] with tools" and "tear[ing] stuff apart and fix[ing] it." [R. 340]. Plaintiff was currently repairing a lawn mower and attempting to repair a pick-up truck. [R. 340]. Dr. Arnold diagnosed Plaintiff with bipolar disorder, in partial remission; self-reported dyslexia; and gout. [R. 340]. According to Dr. Arnold, Plaintiff's current Global Functioning Assessment ("GAF") score was a 58. [R. 340].

On July 6, 2009, Robert Estock, M.D., completed a Psychiatric Review Technique based upon Plaintiff's affective and anxiety-related disorders. [R. 319-332]. More specifically, Dr. Estock

analyzed how Plaintiff's bi-polar disorder and panic disorder limited his functioning. [R. 322, 324]. Dr. Estock opined that Plaintiff has mild limitations in activities of daily living, moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace. [R. 329]. Dr. Estock noted that Plaintiff showed no signs of decompensation. [R. 329]. Dr. Estock commented that Plaintiff's earnings ruled out an inability to work due to lower IQ. [R. 331].

Also on July 6, 2009, Dr. Estock completed a Mental RFC Assessment. [R. 333-335]. Dr. Estock concluded that Plaintiff was either moderately limited or not significantly limited in the following categories: (1) understanding and memory; (2) sustained concentration and persistence; (3) social interaction; and (4) adaption. [R. 333-334]. Dr. Estock stated that Plaintiff "can understand, remember, and complete short, simple 1-to-2 step tasks, but not those that are longer or more detailed. [R. 335]. Dr. Estock further noted that Plaintiff "can follow simple directions in order to find locations and complete tasks." [R. 335]. According to Dr. Estock, Plaintiff appears able to work an 8-hour work day, provided he receives customary breaks. [R. 335]. Dr. Estock also opined that Plaintiff could tolerate casual, non-intense interaction with the general public and with co-workers and supervisors. [R. 335].

At the behest of Plaintiff's counsel, Robert A. Storjohann, Ph.D., completed a psychological evaluation of Plaintiff on August 10, 2009. [R. 363]. Dr. Storjohann administered a variety of tests and ultimately made the following diagnoses: (1) bipolar disorder; (2) chronic, severe posttraumatic stress disorder; (3) generalized anxiety disorder; (4) social phobia with panic attacks; (5) reading disorder; (6) disorder of written expression; (7) borderline intellectual functioning; (8) paranoid personality disorder; (9) schizoid personality disorder; (10) borderline personality disorder; and (11) various physical ailments including occasional bouts of gout in feet and legs. [R. 370]. Dr.

7

Storjohann found that Plaintiff's current GAF score was 40 and that it had been no higher in the past year. [R. 370]. According to Dr. Storjohann, Plaintiff's "prognosis for improvement during the coming 6 to 12 months [was] considered to be extremely poor given his health problems, his chronic pain, the chronicity instability, and severity of his psychiatric difficulties, and his intellectual and academic limitations." [R. 370]. Based upon his examination, Dr. Storjohann opined that Plaintiff appeared to have "moderate to marked deficits in his ability to understand, carry out, and remember instructions in a work setting" and that Plaintiff appeared to have "marked to extreme deficits in his ability to respond appropriately to supervision, coworkers, and work pressures in a work setting." [R. 370].

## II.   ALJ Decision

Disability under the Act is determined under a five-step test. 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii). Absent such impairment, the claimant may not claim disability. *Id.* Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See*

20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments. 20 C.F.R. § 404.1520(e). In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled. *Id.* If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step. 20 C.F.R. § 404.1520(a)(4)(v). In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

The court recognizes that "the ultimate burden of proving disability is on the claimant" and that the "claimant must establish a *prima facie* case by demonstrating that he can no longer perform former employment." *Freeman v. Schweiker*, 681 F.2d 727, 729 (11th Cir. 1982) (other citations omitted). Once a claimant shows that she can no longer perform her past employment, "the burden then shifts to the [Commissioner] to establish that the claimant can perform other substantial gainful employment." *Id.*

Here, the ALJ found that Plaintiff engaged in substantial gainful activity from the alleged onset date of October 15, 2007 through February 27, 2009. [R. 11]. The ALJ noted that Plaintiff initially alleged he became disabled on October 15, 2007 when he was terminated from FabArc Steel Supply but that he subsequently worked as a welder and tree trimmer's assistant in 2008 and early 2009. [R. 11]. According to the ALJ, Plaintiff's earnings records and work history support a potential onset date of February 27, 2009, the day Plaintiff was terminated from work as a tree trimmer's assistant. [R. 11]. The ALJ then noted that there had been a continuous 12-month period during which Plaintiff had not engaged in substantial gainful activity; therefore, the remainder of the ALJ's analysis addressed that period. [R. 11].

The ALJ determined that Plaintiff suffered from gout, dyslexia, and affective, anxiety, and personality disorders, all of which are "severe" as defined by the Act. [R. 11]. Nonetheless, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Appendix 1. [R. 12]. After consideration of the entire record, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. 404.1567(c) but is restricted from occupations requiring reading or contact with the general public. [R. 14]. The ALJ then determined that Plaintiff could perform his past work as a welder and tree trimmer's assistant. [R. 20]. The ALJ concluded that this work did not require the performance of work-related activities precluded by Plaintiff's RFC. [R. 20]. Alternatively, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, other jobs existed in significant numbers in the national economy that Plaintiff could perform. [R. 21]. These include dowel inspector, cuff folder, and nut sorter. [R. 21].

Accordingly, the ALJ ruled that Plaintiff is not disabled as that term is defined in the Act, and therefore is not entitled to DIB or SSI. [R. 22].

**III.     Plaintiff's Argument for Remand or Reversal**

Plaintiff seeks to have the ALJ's decision reversed, or in the alternative, remanded for further consideration. [Pl.'s Mem. 15]. Plaintiff argues that the ALJ's decision is not supported by substantial evidence and improper legal standards were applied because: (1) the ALJ understated the negative impact of Plaintiff's emotional problems on his ability to engage in substantial gainful activity and (2) the ALJ should have contacted Dr. Jin to obtain an explanation for why his opined physical restrictions were more severe than the documented medical problems. [Pl.'s Mem. 4, 14].

**IV.     Standard of Review**

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982); *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. § 405(g) mandates that the commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a

conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1259.

**V.      Discussion**

After careful review, the court concludes that the ALJ's decision is due to be affirmed for the reasons discussed below.

> **A.      The ALJ Did Not Err in Rejecting the Opinions of Dr. Archibald and Dr. Storjohann**

Without stating so precisely, Plaintiff's argument that the ALJ understated the negative impact of his psychological condition on his ability to work is grounded in the contention that the ALJ did not properly consider opinions provided by Dr. Archibald, Plaintiff's treating psychiatrist, and Dr. Storjohann, a one-time examiner. [Pl.'s Mem. 5-12].

Regarding Dr. Archibald's opinion, the Eleventh Circuit's "treating physician rule" is the appropriate standard. When according weight to the opinion of a treating source, it is well-established that the opinion must be given substantial, considerable, or event controlling weight unless "good cause" is shown to the contrary. *See e.g.*, *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). "Good cause" exists when: (1) the treating physician's opinion is not bolstered by the evidence; (2) evidence supports a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing *Lewis*, 125 F.3d at 1440). When the ALJ disregards the opinion of a treating physician, he

12

must clearly articulate his reasons for doing so. *Id.* Failure to do so constitutes reversible error. *Lewis*, 125 F.3d at 1440.

In making his mental RFC finding that Plaintiff should be restricted from occupations requiring contact with the general public, the ALJ specifically considered Dr. Archibald's "longitudinal observations" but ultimately accorded limited weight to his opinion. [R. 18-19]. The ALJ stated that Dr. Archibald's conclusions regarding Plaintiff's work limitations were not consistent with other evidence of record including Plaintiff's testimony and earnings history indicating that he was able to work for several years as a welder and more recently as a tree trimmer's assistant (after the alleged onset date) without being fired due to disputes with co-workers. [R. 19]. The ALJ also noted that Dr. Archibald's finding that Plaintiff's interests were constricted to a moderately severe degree by his mental impairments conflicted with his own treatments notes transcribed on the same day (August 3, 2009) that indicated "a lot of [Plaintiff's] restrictive behavior is because his wife does not want to do things and he will not leave her." [R. 19]. Moreover, the ALJ noted that Plaintiff's demonstrated capacity to work despite his mental impairments[2] and his reported daily activities were inconsistent with Dr. Archibald's findings. Plaintiff reported that he performed personal care, prepared meals, did household chores including mowing two acres, and that he enjoyed fixing lawn mowers and trucks. [R. 19]. The ALJ also commented that Plaintiff had recently attended a holiday cookout with family members, which demonstrated Plaintiff could interact with familiar individuals. [R. 20]. Thus, the ALJ assigned little weight to Dr. Archibald's

---

[2]The ALJ indicated that Dr. Archibald's treatment notes indicate that Plaintiff's alleged disabling impairments were present at approximately the same level of severity when he worked prior to and after the alleged disability onset date. [R. 19]. Notably, when asked by the ALJ how he was able to work through February 2009, sixteen (16) months after the alleged disability onset date, despite his mental impairments, Plaintiff testified that he "just done it." [R. 52].

opinion because it was "incompatible with [Plaintiff's] demonstrated functional capacity, namely his ability to continue working and maintain a normal set of independent daily activities despite his mental impairments." [R. 20].

The ALJ's finding that Dr. Archibald's opinion was inconsistent with his own medical records and that his opinion was not bolstered by other evidence of record is (a) supported by substantial evidence and (b) constitutes "good cause" for rejecting this opinion. *See Phillips*, 357 F.3d at 1241. Therefore, the court finds that the ALJ clearly articulated his reasons for rejecting Dr. Archibald's opinion and "good cause" existed for doing so. Next, the court considers whether substantial evidence supports the ALJ's decision to reject Dr. Storjohann's opinion.

It is well settled that the opinion of a one-time examiner is not entitled to deference. *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987). Moreover, although the ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion, the ALJ is required to state with particularity the weight he gives to different medical opinions and the reasons why. *Bloodsworth*, 703 F.2d at 1240. Here, the ALJ accorded "somewhat less weight" to the opinion of Dr. Storjohann than he did to the limited weight assigned to Dr. Archibald's opinion. [R. 19].

In assigning little weight to Dr. Storjohann's opinion, the ALJ noted that his findings, based upon a one-time examination, that Plaintiff's degree of restriction in his daily activities and the deterioration in his personal habits was moderately severe, "diverged markedly" from Dr. Archibald's opinion, based upon a five year treatment history, that Plaintiff's restrictions in these areas was only "mild." [R. 18]. Additionally, the ALJ stated that Dr. Storjohann's opinion was not bolstered by evidentiary support and was inconsistent with the record as a whole. [R. 19]. As he did in stating his reasons for assigning limited weight to Dr. Archibald's opinion, the ALJ cited

Plaintiff's continued employment before and after the alleged disability onset date and Plaintiff's activities of daily living as inconsistent with Dr. Storjohann's findings. [R. 19-20]. Additionally, the ALJ indicated that Dr. Storjohann's opinion was not consistent with the findings of another one-time examiner, Dr. Arnold, who concluded that Plaintiff's bipolar disorder was in partial remission and observed Plaintiff performing quick mental math calculations and other reasoning drills. [R. 19].

The ALJ stated with great particularity the reasons for assigning little weight to Dr. Storjohann's opinion, and substantial evidence supports the ALJ's findings. *See e.g., Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (holding that the fact claimant had worked for several years in spite of his seizure disorder, along with medical opinions that claimant's seizure disorder did not prevent him from meeting the demands of unskilled work, constituted substantial evidence which supported the ALJ's decision to discredit the opinion of an examining physician that the claimant was totally disabled); *Bloodsworth*, 703 F.2d at 1240 ("[T]he Secretary may reject the opinion of any physician when the evidence supports a contrary conclusion.") (internal citations omitted).

### B. The ALJ Did Not Err in Failing to Recontact Dr. Jin

Plaintiff next asserts that the ALJ had a duty to recontact Dr. Jin to explain why the restrictions identified in his consultative examining report were greater than Dr. Jin's diagnosed physical impairments and his examination findings. [Pl.'s Mem. at 14]. Plaintiff cites no legal authority for this proposition. However, the court does note that the regulations governing recontacting consultative examiners state that "[i]f the report is inadequate or incomplete, we will contact the medical source who performed the consultative examination, give an explanation of our

evidentiary needs, and as that the medical source furnish the missing information or prepare a revised report." 20 C.F.R. §§ 404.1519p(b), 416.919p(b). The regulations further provide that, although the agency will normally request as part of the consultative examiner's report a medical source statement regarding what a claimant can do despite his limitations, one is not required and the lack of such a report does not make the record incomplete. *See* 20 C.F.R. § 404.1519n(c)(6). Because Dr. Jin was not required to provided a functional capacity opinion, the ALJ had no duty to recontact him for an explanation of his findings.

Moreover, as already noted above, the ALJ was free to reject Dr. Jin's opinions, based upon a one-time consultative examination, as long as he stated the reasons for doing so. Dr. Jin's opinion was entitled to no special deference. *See McSwain*, 814 F.2d at 619. The ALJ assigned no weight to Dr. Jin's opinion regarding Plaintiff's functional limitations because his medical source statement was inconsistent with his own examination notes and observations. [R. 15-16]. Specifically, the ALJ stated that Dr. Jin's opinion is "unsubstantiated by his largely benign clinical examination findings." [R. 16]. Thus, because the ALJ found that evidence supported a contrary conclusion, the ALJ properly rejected Dr. Jin's opinion by explicitly stating the reasons for doing so. Therefore, because (1) the ALJ had no duty to recontact Dr. Jin and (2) the ALJ stated that he assigned little weight to Dr. Jin's opinion because Dr. Jin's own examination notes, which formed part of the evidence of record, were inconsistent with his Jin's ultimate opinion regarding Plaintiff's limitations, substantial evidence supports the ALJ's findings on this issue. *See e.g., Bloodsworth*, 703 F.2d at 1240 (ALJ may reject opinion of any physician when the evidence supports a contrary conclusion as long as the ALJ states his reasons for doing so). The ALJ's decision is not due to be reversed on this ground.

## VI.  CONCLUSION

For the reasons outlined above, the court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and proper legal standards were applied. Therefore, the Commissioner's decision is due to be affirmed. A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this ___24th___ day of April, 2013.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE